**KEOKUK STATE BANK,**
**Plaintiff-Appellee,**

v.

**Dallas ECKLEY, Karen Eckley, and**
**Scott Eckley,**
**Defendants-Appellants.**

No. 83–728.

Court of Appeals of Iowa.

May 22, 1984.

Stephen, C. Gerard II, Iowa City, for plaintiff-appellee.

D.W. Harris and R. Kurt Swaim, Bloomfield, for defendants-appellants.

Considered by OXBERGER, C.J., and HAYDEN, and SACKETT, JJ.

SACKETT, Judge.

Defendants, Dallas, Karen, and Scott Eckley, appeal from a judgment on a forcible entry and detainer action for the plaintiff, Keokuk Bank. The trial court granted the Keokuk Bank possession of Dallas and Karen Eckleys' 27-acre homestead. They had purchased the property on contract from Downey in 1972. In 1981, Downey sold his vendor's interest in the contract to the Keokuk Bank. Defendant Scott Eckley is the 18-year-old son of Dallas and Karen. Scott lived with his parents and maintained a hog operation on one and one-half acres of the 27-acre tract.

The Eckley/Downey contract provided for a total purchase price of $33,800, payable at the rate of $200 on or before the first of each month commencing September 1, 1971. The payments were to apply first to principal and then to interest. The Eckleys were to pay real estate taxes and insure the property from fire, wind, and other casualties. They were also to maintain life insurance on Dallas. The insur-

ance coverage in both cases was to be in an amount equal to the contract balance. At the time of trial the fair market value of the homestead was $97,435. The balance due under the contract was $22,639.85. The contract provided for forfeiture under Chapter 656 of the Iowa Code in the event the buyers failed to comply with the terms of the contract.

At about noon on November 1, 1982, Dallas and Karen were served with a notice of forfeiture of real estate contract which provided as follows:

TO: DALLAS ECKLEY and KAREN ECKLEY

1. You're in default for failing to make six monthly installment payments: January, February, March, April, May, and November, 1982. $1,200.00

2. You have failed to pay real estate taxes when due for the revenue fiscal year 1980–81, including penalty. 1,026.39

Interest at 18% per annum from 6–22–82 to 11–1–82 on advancement to pay real estate taxes. 66.81[1]

3. You have failed to pay real estate taxes when due for the revenue fiscal year 1981–82, first half, plus penalty. 528.49

Interest at the rate of 18% per annum from 10–11–82 to 11–1–82 on advancement to pay real estate taxes 5.21

4. You have failed to keep the property insured and/or to deposit such insurance policy with Vendors Successor.

5. You have failed to maintain life insurance and/or to deposit the policy with Vendors Successor.

6. Vendors Successor has incurred attorneys fees in this action to collect the above sums payable or secured herein. 100.00

7. Vendors Successor will incur the costs of serving this notice.

TOTAL AMOUNT DUE
(plus costs of service) $2,926.90

The forfeiture notice was not directed to Scott, and Scott was not served with a copy of the notice.

In order to avoid forfeiture under the contract, the Eckleys had thirty days after service of notice to perform the terms and conditions in default. Iowa Code § 656.2(3) (1981). Dallas and Karen Eckley learned on the 30th day they would be unable to tender the alleged deficiencies. On December 7, 1982, the Keokuk Bank filed an affidavit, pursuant to Iowa Code section 656.5 (1981), in support of forfeiture of the real estate contract. On December 10, 1982, Scott offered to tender all deficiencies alleged by the bank. Scott's tender was rejected by the bank on December 14, 1982.

A notice to quit was served, and a forcible entry and detainer action was commenced against all three defendants. The trial court, after hearing the evidence, found that the bank had complied with all forfeiture requirements and therefore now had valid title to the real estate in question. The trial court further found that Scott was a nonparty, unemancipated minor living with his parents when the forfeiture occurred and that he therefore was not entitled to notice.

### I.

Defendant Scott appeals, contending that he was a party in possession and therefore entitled to a notice of forfeiture.

This action is in equity and we therefore find the facts anew. *Lett v. Grummer,* 300 N.W.2d 147, 148 (Iowa 1981); *Freese Leasing Inc. v. Union Trust and Savings Bank,* 253 N.W.2d 921, 925 (Iowa 1977). Equity abhors forfeitures. *Lett v. Grummer,* 300 N.W.2d at 149; *Roshek Realty Co. v. Roshek Brothers Co.,* 249 Iowa 349, 358, 87 N.W.2d 8, 13 (1957).

In 1979 Scott received a loan from the Farmers Home Administration which enabled him to go into the hog business. At that time he opened a joint account with Farmers Home at the Keokuk Bank. Scott bought fencing and fenced off one and one-half acres of the 27-acre tract. He put up one hog house and three hog shades. He poured a permanent concrete slab. He did wiring and put up a trouble light.

---

1. Because of our holding in this case, we need not address the issue of the bank's attempt to collect 18 percent interest on advancements to pay real estate taxes.

These improvements were paid for with checks drawn on Scott's account at the Keokuk Bank. Scott helped his parents with chores in exchange for use of the property.

Iowa Code section 656.2, with reference to service of a notice of forfeiture of real estate contract, provides:

Such forfeiture and cancellation shall be initiated by the vendor or by his or her successor in interest, by serving or causing to be served on the vendee or his or her successor in interest, and on the mortgagee or assignee for security purposes of the vendee or his or her successor in interest, if the interest of such mortgagee or assignee for security purposes is of record, and *on the party in possession* of real estate, ... [emphasis added]

Forfeiture is not effective if no notice has been served on the party in possession. *Fulton v. Chase*, 240 Iowa 771, 37 N.W.2d 920 (1949).

In law, the term [possession] is defined as meaning an act, fact, or condition of a person having such control of property that he may *legally enjoy it to the exclusion of others having no better right than himself;* the physical control of a thing which belongs of right to *unqualified ownership in such a manner as to exclude control by other persons.* [emphasis added]

*Warren v. Yocum*, 223 N.W.2d 258, 261 (Iowa 1974) (*quoting* 72 C.J.S. at 234).

Possession is further defined as:

That condition of facts under which one can exercise his power over a corporeal thing at his pleasure to exclusion of all other persons.

*Warren v. Yocum*, 223 N.W.2d at 261. The term "possession" means the control or custody of a thing for occupation and enjoyment. As said in *Redfield v. Utica & S.R. Co.*, 25 Bar. (N.Y.) 54:

Possession is the detention or enjoyment of a thing which a man holds or exercises by himself, or by another who keeps or exercises it in his name. Occupancy or possession, by one, implies the exclusion of every other individual from the occupancy and possession.

*Starits v. Avery*, 204 Iowa 401, 403, 213 N.W. 769 (1927).

Scott lived with his parents and used a small portion of the farm for his hog operation. There is no evidence that he used the premises to the exclusion of others; namely, his parents, who were the parties in possession.

This position is consistent with the holding in *Eastman v. De Frees*, 235 Iowa 488, 491, 17 N.W.2d 104, 105 (1945), where neither the tenants occupying an apartment house nor the wife who assisted with the apartment business were determined to be parties in possession; *Hansen v. Chapin*, 232 N.W.2d 506, 511 (Iowa 1975), where service on wife of vendee who lived with vendee on the premises was not necessary for forfeiture; and *Warren v. Yocum*, 223 N.W.2d 258, 261 (Iowa 1974), where persons who parked three or four vehicles on premises at various times were determined not to be parties in possession.

Scott was not the party in possession. He was merely a family member living on the premises. He was not a necessary party to the forfeiture notice. We agree with the trial court's finding that Scott was not a party in possession entitled to notice under Iowa Code section 656.2 (1981), and that the forfeiture was therefore not ineffective because of faulty notice.

There are several items on the forfeiture notice, however, which do not provide a basis for forfeiture.

## II.

The Keokuk Bank, in its notice of forfeiture, alleged that the November 1, 1982, payment of $200 had not been made.

The forfeiture notice was served shortly after 12 o'clock noon on November 1, 1982. The November payment was due on November 1 and would not be delinquent until November 2nd. The November payment was tendered to the bank on the afternoon of November 1 and was refused. The bank

cannot forfeit the contract on the basis of the November payment. The alleged default had not occurred at time of service of notice. "[C]ontracts involving a forfeiture cannot be extended beyond the strict and literal meaning of the words used." *Lane v. Crescent Beach Lodge and Resort, Inc.*, 199 N.W.2d 78, 81–82 (Iowa 1972). Because there was no default with respect to the November, 1982, payment, it cannot form a basis for forfeiture of the contract.

### III.

■ The Keokuk Bank, in its forfeiture notice, claimed attorney fees for the action to collect the sums payable therein. The requested attorney fees cannot be charged against Dallas and Karen. The cost of attorney fees, even if established as reasonable and necessary, are not included as part of the reasonable costs of serving notice under section 656.4. The statute makes no mention of attorney fees, and the court assumes the omission was deliberate.

A vendee, in order to comply with notice and avoid forfeiture under section 654.4, need not pay for preparation of the notice, only the reasonable costs of serving it. *Miller v. American Wonderlands, Inc.*, 275 N.W.2d 399, 401 (Iowa 1979). Keokuk Bank is not entitled to recover attorney fees as part of the reasonable cost of serving notice.

### IV.

Dallas and Karen contend that the forfeiture should not have been enforced because they owed the bank no money, they were not in substantial violation of the contract, or if they were in violation, the bank had waived its right to forfeiture and was therefore estopped from forfeiture. The bank argues that it proved the items of forfeiture and was not estopped from forfeiting the contract.

A history of the dealings of the parties is necessary. Dallas had borrowed considerable money from the Keokuk Bank. Karen had borrowed from the bank, but not to the extent Dallas had borrowed.

In 1981, Dallas and Karen began to experience financial difficulties. Together with the bank they devised a plan whereby they would take bankruptcy, discharge fourteen other creditors, and reaffirm their debt to the bank after discharge.[2] We have not been called upon to determine the legalities of this agreement, nor are there sufficient facts in the record for us to do so. We do not intend by this opinion to approve in any way of the agreement between the bank and Dallas and Karen to prefer the bank over other creditors.

On July 3, 1981, Dallas assigned his interest in the Dale William Eckley Trust to the Keokuk Bank.

Dallas and Karen filed a petition in bankruptcy on December 15, 1981. On January 11, 1982, the bank filed a secured claim for $92,000.14, plus interest. The claim was not itemized, but was based on the notes and security agreements attached to the claim. Attached to the claim were twenty-two notes, financing and financial statements, and an assignment by Dallas to the bank of his interest in the Dale William Eckley Trust.

On April 25, 1983, Dallas received only a verification of account and loan balances from the bank indicating that the bank's records showed that Dallas owed the bank a total of $100,407.07 on twenty-two separate notes.

On May 4, 1982, prior to their discharge hearing, the Eckleys' attorney sent a letter to the bankruptcy court, with copies to the bank and the bank's attorney, which provided in part:

> Although Debtors [Dallas and Karen] have not made payments since December or January, 1982 [on the contract in question], they intend to commence $200.00/month payments, principal and interest, on June 1, 1982 until fully paid, and to have the contract extended by the length of time of the missed payments.

---

2. Only one note was ultimately reaffirmed by the Eckleys.

Dallas and Karen received their discharge in bankruptcy on May 10, 1982. They did not make the $200 monthly payments in January, February, March, April, and May of 1982. They made, and the Keokuk Bank accepted, the monthly payments in June, July, August, September, and October of 1982.

Following the bankruptcy, certain of the Eckleys' personal property was turned over to the Keokuk Bank. On August 27, 1982, the bank sold other such personal property and credited $12,865.78 to four notes signed by Dallas alone. Both of these credits resulted from the voluntary surrender of items to the bank. Karen claims the items surrendered were half hers and that her half of these credits, less individual obligations she hàd at Keokuk Bank, were more than sufficient to bring this contract current. A $1,200 credit was made on one of Dallas's notes in August of 1981 from the sale of such property.

Mr. Marget, the chairman of the board of directors of Keokuk Bank, was asked on cross-examination with reference to the $1,200 as follows:

Q. And who determined what notes you were going to give the credit on? A. Whoever did this put the credit on it.

Q. They just took them helter-skelter; did they? A. Yeah. It ends up on that note. That was made August 30, 1982, that payment.

We have spent a considerable amount of judicial time in an effort to reconcile the accounts of Dallas and Karen at the Keokuk Bank following the bankruptcy. After a careful and laborious examination of the record, we determine that the record before us is not sufficient to make such a determination.

At trial Mr. Marget, chairman of the board of Keokuk Bank, testified that the payments made were credited to January, February, March, April, and May. Marget signed an affidavit indicating the January-May payments were not made. The bank paid real estate taxes of $1,026.39 on June 1, 1982, and $528.49 on October 11, 1982.

The Eckleys contend that by accepting the $200 payments on the contract in June, July, August, September, and October, the Keokuk Bank is estopped from forfeiting the contract based on the January, February, March, April, and May payments. They argue further that there were no sums due under the contract and that there was no substantial violation of the contract.

Persons or institutions seeking a forfeiture of a real estate contract have an obligation to present evidence from which the courts can readily determine the alleged deficiencies. It is particularly bothersome in this instance because the party seeking the forfeiture is a lending institution that obviously has trained persons and equipment available to make these calculations. But they have failed even to attempt to make any such calculations.

█ The bank has the burden of proving the existence of facts which entitle them to forfeiture under the terms of the contract. *Lane v. Crescent Beach Lodge & Resort, Inc.*, 199 N.W.2d 78, 81 (Iowa 1972); *Tait v. Reid*, 158 Iowa 466, 472, 139 N.W. 1101, 1103 (1913).

While the Eckleys admittedly did not make the $200 payments in January, February, March, September, and May, and did not pay the real estate taxes, it is impossible from this record to determine whether or not Karen should, as she claims, have sufficient credit at the Keokuk Bank to satisfy this delinquency. She made no demand prior to forfeiture that the proceeds from the sale of these items be credited to the contract in question. However, it was not until these items were voluntarily transferred to the Keokuk Bank and sold that Keokuk Bank sought to collect the payments that remained delinquent during the bankruptcy proceedings.

Because of the confusing record before us, we make no determination as to whether or not Karen has sufficient credit at Keokuk Bank to satisfy delinquent contract payments. We do, however, consider the Keokuk Bank's failure to make an adequate accounting of these payments in our determination of this case.

The Eckleys claim that if there was a breach, it was not substantial enough to support statutory forfeiture; and that it is inequitable to forfeit a contract on a $97,000 piece of property for a $22,000 debt. The Keokuk Bank argues there is an additional $80,000 owed to the bank and secured by an assignment of the Eckleys' interest in the real estate contract. The bank argues that because the Eckleys deceived the bank into thinking they would reaffirm the debt, they should not prevail.[3] The Eckleys further claim that the Keokuk Bank is estopped on their claim and the Keokuk Bank gave misleading information to the Hayesville Bank.

After receiving the notice of forfeiture, Dallas and Karen immediately sought financing with the Hayesville Bank. The Hayesville Bank agreed to make the loan if there was sufficient equity in the real estate to secure the loan and if this equity could be assigned to Hayesville. The Eckleys found out on the 30th day that their loan with Hayesville would not be approved. The attorney for Hayesville and Mr. Harris, an employee of Hayesville, had been in contact with the attorney for the Keokuk Bank who advised Hayesville that there were liens existing on the Eckleys' property in favor of Keokuk Bank and therefore authorizing the loan was not advisable. The law firm representing Keokuk Bank had, on various occasions, represented the Hayesville Bank.

After the loan application was made, the Eckleys had checked with Hayesville on numerous occasions. Hayesville was checking on the title through several attorneys. Mr. Harris of the Keokuk Bank was questioned:

Q. And what did you decide on the 30th of November? [November 30th being the last day]

A. We were still waiting for Mr. Hoadley [Eckleys attorney at the time] to get back to us. He called that afternoon—I believe it was, on the 30th, and he said it looked like through the bank-

ruptcy of the Eckleys that any claims against the contract had been released ... I had a conversation with him and told him that we had been advised through Mr. Morrison, who talked to Steve Gerard II, in Iowa City, that the claim against the contract was still valid and also that there was no equity available in it, that that equity had been assigned on various other notes and that this had carried on through the bankruptcy.

Q. To the Keokuk County State Bank?

A. Yes...

The Hayesville Bank apparently did not make the loan because of their belief that Dallas and Karen had assigned all of their equity in the contract to Keokuk County State Bank. Keokuk Bank had, on January 17, 1979, caused to be filed with the Keokuk County Recorder, a security agreement which the Keokuk Bank alleged that Dallas and Karen signed on January 4 of 1979. The security agreement gave the bank a security interest in the Eckleys' equity in the real estate contract in question. Dallas and Karen denied knowledge of or signing the agreement and argued that if they did sign the agreement, it was signed in blank. A copy of the agreement had been attached to the bank's claim in the bankruptcy proceeding. Because of our holding, it is unnecessary for us to determine whether or not Eckleys signed the document, and we decline to do so. After January 4, 1979, Dallas alone signed seven notes which stated: "This note is secured by a security agreement date 1–4–79." Dallas *alone* signed one note which contained the following language: "[D]ebtors hereby grant to the Secured party above, a security interest in the following described property ... also security agreements dated among other 1–4–79."

Iowa Code section 561.13 (1983) provides:

*A conveyance or encumbrance of,* or contract to convey or encumber *the*

---

**3.** Bankruptcy is a right created by act of congress. The Keokuk Bank had notice of its opportunity to advance its claims to the bankruptcy court. Our purpose is not to litigate issues properly in the bankruptcy proceeding, nor will we treat the Eckleys any differently because they filed for bankruptcy.

*homestead,* if the owner is married, *is not valid, unless and until the spouse of the owner executes the same or a like instrument,* or a power of attorney for the execution of the same or a like instrument, *and the instrument or power of attorney sets out the legal description of the homestead. . . .*

In *Farmers Trust & Savings Bank v. Manning,* 311 N.W.2d 285, 288 (Iowa 1981), the supreme court held that where a mortgage, executed by a husband and wife, provided that it would stand as security in present *and future* loans made to both mortgagors, subsequent loans made to the husband alone were not secured by the mortgage.

The legislature has clearly mandated the requirements for encumbering a homestead. Those requirements were not met here. The legislature recognizes a homestead is a precious property and should only be encumbered when the encumbrance meets the statutory requirements.

Despite the Keokuk Bank's claim that they have encumbrances on the homestead in this cause in excess of $80,000, these subsequent notes are not an encumbrance on the homestead.[4] The Hayesville Bank did not make the loan because Keokuk Bank's attorney advised them that the subsequent notes were liens on the homestead. We consider these facts in our determination.

The Eckleys next contend Keokuk Bank is estopped from forfeiting because of their acceptance of the later five payments.

■ The doctrine of equitable estoppel or estoppel in pais is founded upon principles of morality and fair dealing and is intended to subserve the ends of justice. 28 Am.Jur.2d *Estoppel and Waiver* § 28 (1966).

Generally speaking, ... equitable estoppel is a rule of justice which, in its proper field, prevails over all other rules. It is a rule of last resort, but when it is aroused into activity, it stays the operation of other rules which have not run

their course, when to allow them to proceed further would be a greater wrong than to enjoin them permanently. 28 Am.Jur.2d *Estoppel and Waiver* § 34 (1966).

■ An estoppel may arise under certain circumstances from silence or inaction as well as from words or actions. In certain cases the mere silence of the estopped party and his failure to assert the right later claimed will be construed as a representation that he does not have the rights which he later attempts to assert. 28 Am.Jur.2d *Estoppel and Waiver* § 53 (1966).

■ In this case, the bank received a notice that payments on the contract would commence June 1 and would continue until fully paid. The payments were made as promised, and the bank accepted the payments for five months before taking any action. We must determine whether the bank was therefore estopped from asserting the delinquency of those five payments as a basis for statutory contract forfeiture at a later date.

In *Janes v. Towne,* 201 Iowa 690, 694, 207 N.W. 790 (1926), the supreme court said:

"A waiver once made cannot be recalled. Hence, after a party has acquiesced in a breach of the contract, he cannot thereafter urge a forfeiture because of such breach, unless he has given reasonable notice of an intention thereafter to enforce the contract according to its terms. . . . Where a stipulation for performance at a particular time has been waived, the party in whose favor the waiver operates is thereafter bound only to perform within a reasonable time, except in a case where there has been a specific extension of time, in which case it is held that the new time fixed becomes of the essence, as was the case in the original contract. So, where the time fixed by the contract for performance is permitted to pass, both parties concurring, the time of performance thereafter becomes indefinite, and one party cannot

---

**4.** There is one note in the record signed by both Dallas and Karen prior to 1–4–79 which shows a balance due of approximately $700 which could be a lien on the homestead. We are unable to find any other notes in the record which encumber the Eckley homestead.

rescind *until full notice and a reasonable time for performance is given."* [citing 13 C.J. 609, 690]

The court in *Janes* noted that this equitable rule is not intended to excuse the obligor from a continuing obligation to pay; but that equity seeks only to protect the debtor from suddenly becoming entrapped by the sufferance previously extended by the creditor. *Janes v. Towne,* 201 Iowa at 695, 207 N.W. 790. Under the general rule, "[i]f sufferance, once given, is to cease, then it must not cease so suddenly as to entrap the debtor." *Id.* Rather, "[n]otice must be given, and a reasonable time for the defendant to adapt himself to the attitude of the creditor, before a forfeiture shall become effective." *Id.* at 695–96, 207 N.W. 790. The *Janes* court went on to say that section 4299, code of 1897 (a forerunner to our current forfeiture statute), was enacted in response to this rule of equity. *Id.* at 696, 207 N.W. 790. The court held:

His [seller's] long sufferance did not forbid his subsequent demand for payment. He waived the punctuality, but did not waive the payment. The sufferance operated solely as a favor to the defendant. Under our statute, it could not operate to endanger him. He was secure at all times in thirty days of grace after written notice of intention. Neither the sufferance nor the subsequent notice imposed upon him any additional penalty, nor acceleration of any due date.

*Id.* at 696–97, 207 N.W. 790.

We find therefore that the Keokuk Bank acquiesced in a breach of the contract and that the Eckleys were entitled to a reasonable notice that the bank intended to collect the delinquent payments rather than to add them to the principal balance due on the contract. We must next determine whether the notice given was sufficient under these circumstances. *See Bettis v. Bettis,* 228 N.W.2d 193, 195 (Iowa 1975) (court must determine whether the thirty-day statutory notice allows a reasonable opportunity for performance of conditions previously waived).

The Iowa Supreme Court has said:

[T]he statutory notice of forfeiture was not intended to preclude *in all cases* the right to additional time within which to bring previously waived payments to current status. [emphasis added].

*Id.*

The unique circumstances here make the rule in *Bettis* particularly applicable. The Keokuk Bank was not the original vendor. At the time the Keokuk Bank purchased the vendor's interest in the contract, Dallas had incurred substantial obligations to the bank. The bank failed to account to the Eckleys for sums received on the sale of personal property voluntarily transferred to the bank. The bank gave no negative response to the Eckleys' offer to commence payment on the contract and to add the delinquent payments to the principal amount due until *after* the voluntary transfer of the personal property. While the bank had a perfect right to collect the delinquent payments, the Eckleys were entitled to a reasonable period of time within which to perform. The thirty-day notice was not reasonable in this cause, particularly in light of the erroneous information relayed by the Keokuk Bank's attorney to the Hayesville Bank, which prevented Dallas and Karen from obtaining financing. The fact that the bank rejected Scott's tender of the amounts claimed by the bank also mitigates in favor of the Eckleys. Because the notice served on Dallas and Karen did not give them a reasonable opportunity to cure the alleged default, it did not operate to forfeit their interest in the contract in question.

The decision we have reached on the notice issue makes it unnecessary for us to consider the insurance issue.

We reverse the trial court decision, vacate the order of forcible entry and detainer, and restore possession of the property to defendants Dallas and Karen Eckley.

REVERSED AND VACATED.